This is an appeal from the action of the defendant planning and zoning commission of the town of Westport denying the applications of the plaintiff to rezone a thirty-two-acre tract of land owned by the plaintiff from business and residence A to design development district 2-A and for a special permit to allow development of sixteen of the thirty-two acres as a B. Altman store. The commission on its own initiative decided to hold a hearing to amend the Westport town plan of development to designate this subject tract as suitable for so-called design development. The commission held public hearings on all three aspects of the matter on two consecutive nights, June 27 and 28, 1968; and on October 23, 1968, it denied the application. The plaintiff thereafter appealed to this court, claiming that the commission's action was arbitrary, illegal and in abuse of its discretion, and it further makes the claim that the actions of certain members of the representative town meeting constituted a violation of § 8-11
of the General Statutes.
The thirty-two-acre tract in issue has been known for some time as the Westport Sanatorium property and for approximately seventy-seven years a sanatorium was operated on the premises as a profit making enterprise. It is located at the center of Westport near the junction of East State Street, *Page 428 
which is part of route 1, and North Compo Road. Land along East State Street to a depth of 200 feet is presently commercially zoned. The property was sold some time in 1967 to Albert T. Phelps, Jr., the president of the plaintiff, the Second Norwalk Corporation, which filed the instant application on May 16, 1968. Almost from the time that it became known in Westport that the sale of this property had been consummated, rumors began to spread that a large department store was to be erected on this site. In fact, in July of 1967, before the instant application had been filed, petitions were circulated and signed by various Westport shop owners expressing opposition to use of the parcel for a "shopping center." The record in this case, however, makes it abundantly clear that by the time the public hearings were held in June of 1968 the entire community was involved and taking sides on the pending application. Prior to the hearing, various petitions were circulated soliciting signatures supporting or opposing the application. An opposition group, known as the Residents for Enlightened Planning, in addition to circulating petitions to obtain signatures of opponents, solicited funds and hired an attorney to oppose the application at the public hearing.
In Westport, the planning and zoning commission has jurisdiction over planning and zoning under the zoning regulations adopted pursuant to the General Statutes. There is also a representative town meeting, which under chapter 21, § 3, of the Westport town charter has a right to invalidate any action by the planning and zoning commission, in adopting, amending or repealing any zoning regulations, by an affirmative vote of two-thirds of the total number of town meeting members. 28 Spec. Laws 445.
At the public hearings on the plaintiff's applications, the presentations by both sides were unusually *Page 429 
detailed and extensive. Both proponents and opponents were represented by particularly able and experienced counsel with expertise in zoning matters. It appears that the commission, subsequent to the public hearings, had the matter under consideration for a number of months, arriving at its decision on October 23, 1968. It is true, as the plaintiff points out, that the minutes of the executive session setting forth the commission's decision are quite brief in view of the unusual complexity of the matter. It must be kept in mind, however, that this was a decision refusing to grant the zone change and special permit requested. Although it unquestionably would have been helpful, it was not imperative that the reasons for the commission's action be set forth with the detail required in the case of affirmative action granting a zone change. See Hall
v. Planning Zoning Board, 153 Conn. 574, 576.
The minutes state the reasons of disapproval of the rezoning request to be: "(1) That the proposal for development of the property would adversely alter the character of the Town of Westport. (2) A regional shopping center of the size proposed, i.e., B. Altman Co., is undesirable as the traffic generated would cause continual congestion on all roads leading to the location. (3) Possible disruption of the economic health of the established and existing business center. (4) The financial benefit to be realized is not commensurate with the disadvantages to be experienced." The concluding portion of the relevant minutes show only that the application for a special permit was denied by the same 5 to 0 vote of the commission.
At the trial in this court, the plaintiff presented testimony on the following issues: (1) restraint of trade; (2) confiscation; (3) improper influence brought to bear on the commission's decision. *Page 430 
 RESTRAINT OF TRADE
The plaintiff argues that a series of actions and events, right up to the public hearings, built up opposition to the application which constituted, in legal effect, a restraint of trade. It referred to the fact that as early as July, 1967, petitions had been circulated among Westport shop owners expressing opposition to another shopping center and claiming that it would endanger existence of present business in Westport. Although the plaintiff claimed that the chamber of commerce was involved and had, through its attorney, requested continuance of the hearing from its original date of June 3, 1968, to the later June 27 date, a former president of the Westport chamber of commerce, testifying at the trial, denied that the petitions signed by various merchants dated July 24, 1967, had been prepared on behalf of the Westport chamber of commerce.
The plaintiff's brief claims that the denial of its application "was clearly based upon improper motives and reasons and due to pressures of the merchant interest group." It cites in support of its contentionsBenson v. Zoning Board of Appeals,129 Conn. 280, 284, and Boyle Appeal, 179 Pa. Super. 318,324. It is true that Benson, involving an appeal from the denial of a variance, states that "[t]he court was correct in holding that the zoning authority has no right to regard the prevention of competition as a factor in administering the zoning law." But, as was pointed out, the record in that case did not establish that the "`objections of competitors' were the basis of the board's denial." The error committed by the lower court was that it assumed that "the `objections of competitors' were the basis of the board's denial of the application, for this is not borne out by the record." *Page 431 
 Boyle Appeal, supra, dealt with the validity of a change of zone from residence district D to commercial district, thereby permitting a shopping center to be constructed on the outskirts of the borough of Crafton in Pennsylvania. In upholding the change, the Pennsylvania Superior Court, which is not the highest appellate court, first stated clearly (p. 324) that "[w]hether the commercial area of a borough should be placed in the geographic center of the borough or at its borders is a matter for council-manic consideration." As a commentary, it then proceeded to remark that the development of shopping centers "has been unfortunate to many merchants who have invested substantial sums in real estate and merchandizing establishments in the central areas of boroughs and cities, but it is not the duty of government to protect established merchandizing businesses from fair competition from those whom shoppers find it more convenient to patronize."
It is true that one of the reasons set out in the minutes of the executive session speaks of "possible disruption of the economic health of the established and existing business center." But the voluminous record in the present case amply supports the conclusion that many factors entered into the commission's decision.
In Mott's Realty Corporation v. Town Plan Zoning Commission, 152 Conn. 535, also cited by the plaintiff in its brief, the issue was whether a plaintiff therein had been able to show that as a result of the change of zone in issue it was specially and injuriously affected in its property rights or other legal rights. The court stated (p. 537) that "[a]t best, the evidence introduced by the . . . plaintiff would create an inference that competition with its lessee's operation might result if the proponents of *Page 432 
the change in zone devoted the site to retail business. That would not be sufficient to qualify the . . . plaintiff as an aggrieved person." It is significant to point out that the case concerned a parcel of 11.42 acres in the rural Wilson section of Windsor, zoned for agricultural use, for which a change of zone to business B-2 was sought. The fact situation there, therefore, is quite dissimilar to the instant case.
 CONFISCATION
This is a companion line of attack to that of the claim of restraint of trade. It hardly needs restating that, under Connecticut zoning law, it is not the highest and best use of the property which controls.State National Bank v. Planning Zoning Commission,156 Conn. 99, 102. The plaintiff's brief in support of its claim sets forth general legal principles which, in the abstract, are correct. And, as the reference to Pennsylvania Coal Co. v. Mahon, 260 U.S. 393,415, points out, "[t]he general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking."
The plaintiff in this court produced a real estate expert who was asked his opinion as to whether, excluding the portion of the front sixteen acres which, for a depth of 200 feet along East State Street, is already zoned for commercial use, the remainder of this front parcel, presently zoned residence A, could be used for residential building. He stated it was not so usable "because it is abutting land that is already committed to either — to a commercial use or to a use in conjunction with a commercial use." On cross-examination, however, he admitted that the rear sixteen-acre portion is usable for residential purposes as presently zoned, and he gave no opinion that the present use of the rear sixteen acres is confiscatory. This distinction takes *Page 433 
on importance because the application for a change of zone encompasses the entire parcel of thirty-two acres and is not separated with regard to this so-called front sixteen-acre parcel. But the real estate expert produced by the opponents stated in his opinion that the entire subject parcel was salable for residential use in one-half-acre lots at a price range of $15,000 to $20,000. This witness testified to the various residential properties now existing in the immediate area and brought out that the right side of North Compo Road, to the north of the business section, was residential.
Del Buono v. Board of Zoning Appeals, 143 Conn. 673, relied on by the plaintiff, concerned a five-acre tract of land in Stratford bounded on the north by a shipyard, on the east by the Housatonic River, on the south by land occupied by a group of dilapidated shanties, and on the west by route 1, a heavily traveled thoroughfare. This court cannot find, as claimed by the plaintiff, that because of the present residential zonal classification of the plaintiff's property beyond the 200 feet depth line, the plaintiff "has, for all practical ends, lost all right to its enjoyment, since it has been stripped of every use to which it might reasonably be put." Id., 677. There was evidence on which the commission could reasonably conclude that the subject parcel still can be used for residential purposes, although such use might not constitute the highest and best use.
Suffield Heights Corporation v. Town PlanningCommission, 144 Conn. 425, also cited in the plaintiff's brief, involved a relatively small parcel of land, an inner lot to the rear of an already existing business zone, which the trial court found would only have "utility for the parking of cars in connection with the extensive public uses of the business zone fronting the public highway." A-355 Rec. Briefs, *Page 434 
back of p. 448. In Corthouts v. Newington, 140 Conn. 284,286, cited by the plaintiff, the factual situation was again entirely disparate, since approximately 18.5 acres of a 30-acre tract, when purchased by the plaintiff therein, were zoned industrial 2. Thereafter, a zone change was made prohibiting "within such a district, the erection of a dwelling of any kind except the residence of a janitor or a caretaker of premises or a plant of a permitted industry." The court further found that the parcel was "not adapted to industrial use, for which there is not any present demand in Newington and none is expected." For the reasons stated, the court held that the amendment would not serve the public health, safety and welfare in any way and that the drastic curtailed use imposed by the amendment was not warranted.
The fact situation in Dooley v. Town Plan ZoningCommission, 151 Conn. 304, also relied on by the plaintiff, must be brought clearly into focus. That case involved a zoning amendment upgrading 404 acres of land from a residence B to a flood plain district classification. The plaintiff owned a substantial portion of land within that area. As the decision points out (p. 311), "[t]here can be no doubt that, from the standpoint of private ownership, the change of zone to flood plain district froze the area into a practically unusable state. The uses which are presently permitted in the new zone place such limitations on the area that the enforcement of the regulation amounts, in effect, to a practical confiscation of the land." It is, therefore, clearly not comparable.
The plaintiff's brief also refers to a decision of this court which was in fact reversed on appeal.State National Bank v. Planning Zoning Commission,156 Conn. 99. The argument had been advanced *Page 435 
at the trial that the commercial B-C zone change sought represented the highest and best use to which the property could be put and that the property was unsuitable for residential development. The Supreme Court (p. 101) discusses "the highest and best use" concept and (p. 102) states that "[t]he commission is not compelled to reclassify a parcel of land into another zone merely because in so doing the applicant would be in a position to receive a greater monetary value for the land under its new classification. The maximum possible enrichment of a property owner is not a controlling purpose of zoning." Although it is true that the subject parcel in the instant case is substantially larger, 32 acres as against 3 1/6 acres, the same claim was made in the State National Bank case as was advanced here, that the 3 1/6 acres had remained residentially undeveloped for many years and were "unsuitable for residential development." The court stated (p. 103) that "[t]he mere fact that the inclusion of the property in a residence zone rather than in a commercial zone might make its use unsuitable is not of controlling significance under the facts." this court cannot find, in the language at page 106, a situation "where the application of zoning to a particular piece of property practically destroys its value for any permitted use to which it can reasonably be put so as to render the zoning regulation confiscatory or arbitrary." The State National Bank decision also makes clear (p. 105) that "[t]he recommendation in the plan of development, pursuant to General Statutes § 8-23, designating appropriate uses for various areas in the town is merely advisory and does not bind the zoning commission."
A decision on the issue of confiscation must always take into account a balancing of the stabilization of property uses and maintenance of property values as against a clear-cut confiscation of property. *Page 436 Damick v. Planning Zoning Commission,158 Conn. 78. See also Rocchi v. Zoning Board of Appeals,157 Conn. 106, 113; McCleskey v. Barrett,386 F.2d 159, 160; Paka Corporation v. City of Jackson,364 Mich. 122, 127; Cleaver v. Board of Adjustment,414 Pa. 367, 372; Board of County Supervisors v.Davis, 200 Va. 316.
 REVERSE SPOT ZONING
The theory advanced by the plaintiff is an interesting one but without substance in the light of the record in this case and must be turned down. Whether a change to business use constitutes spot zoning depends on whether it "serves a public need in a reasonable way or where it is an attempt to accommodate an individual property owner without any concern for the interests of the community."Anderson v. Zoning Commission, 157 Conn. 285, 294.
 UNDUE INFLUENCE
The plaintiff strenuously advances the argument in its brief that various actions taken by opponents in this sharply divided controversy lead inevitably to the conclusion that the commission was subjected to numerous direct and indirect undue influences which prevented it from giving these applications the impartial study and deliberation they warranted in the best interest of the entire community. This legal argument is based on the provisions of § 8-11
of the General Statutes. It is true that, in the enactment of this statute, based on common-law principles, a public policy of the state has been established seeking to prevent miscarriages of justice by allowing the influence on zoning officials to be a factor in zoning decisions. Connecticut has been in the forefront in seeking to ensure the impartiality of zoning decisions. That the issue has been indeed a troublesome one is evidenced by the number of cases which have already been decided by the state's *Page 437 
highest court, based on different factual situations. In Mills v. Town Plan Zoning Commission,144 Conn. 493, it appeared that the plaintiff Mills was the owner of a seventeen-acre tract in Windsor. Thompson, a member of the zoning commission, was closely associated with the major shareholder in a corporation which was interested in buying a twenty-five-acre parcel about two miles northwest of the Mills property, which was unzoned. It appears that at the executive session of the commission, at which the application to rezone the Mills tract was discussed, Thompson made observations and gave reasons why the application should be denied, and seconded the motion to accept the resolution denying it. Another member of the commission, Mooney, prior to the hearing on the Mills application (p. 496) "had stated that the commission was considering the Park Avenue site for the location of a business center and that, although no formal request for a change of the zone in which it was located had been received, the commission had drawn up some recommendations regarding it." It appears he further spoke in favor of this particular site. The decision in Mills (p. 497) refers to the referee's finding that both Mooney and Thompson should have disqualified themselves, that suspicion naturally came into being because of Mooney's publicized comments on the Park Avenue site and Thompson's dealings with the corporate shareholder, and that, as members of the zoning commission, Mooney and Thompson could not be too careful to avoid any suspicion that they might be interested in the Park Avenue site. At page 498, this oft-quoted language appeared: "Public office is a trust conferred by public authority for a public purpose. The status of each member of the commission forbids him from placing himself in a position where private interests conflict with his public duty. It is the policy of the law to keep the official *Page 438 
so far from temptation as to ensure his unselfish devotion to the public interest. He must not be permitted to let personal interests conflict with his public duty. The question becomes primarily one of public policy." It must be pointed out that in Mills
the court found (p. 499) that "[t]he record before us presents, not a possibility of disqualification, but its actuality."
In Senior v. Zoning Commission, 146 Conn. 531, the court turned down the plaintiff's claim that two members of the commission had violated the provisions of General Statutes § 8-11, stating (p. 535): "The record does not indicate that either of them participated in the hearing or decision of the commission on any matter in which he was `directly or indirectly interested in a personal or financial sense.'"
Lage v. Zoning Board of Appeals, 148 Conn. 597, presents a situation where a member of the zoning board of appeals of Madison had spoken in favor of a change of zone for the subject parcel before the planning and zoning commission. He sat as a member of the board on the application for a variance and voted for it, the vote being 5 to 0. The court found (p. 604): "The transcript of . . . [the board member's] statement before the planning and zoning commission does not reveal any direct interest of his in the property. His remarks, however, indicate a preconceived opinion about the desirability of the change, and that opinion must have influenced his vote on the variance. Whether his attitude had any bearing on the decision of his comembers cannot be known." The court nonetheless found no error and allowed the variance to stand.
In Luery v. Zoning Board, 150 Conn. 136, 146, it appeared that a member of the Stamford board of zoning appeals was the executive vice chairman of *Page 439 
the Citizens' Action Council for the Improvement of Stamford. As the opinion states (p. 146): "He appeared at the hearing before the zoning board and stated that as executive vice chairman of the council he had been instructed to read to the board a written statement which he as executive vice chairman had signed and which stated that the executive committee supported the A.M.F. application and urged favorable consideration of it." The court found (p. 147) that, although "[i]n appearing before the board in favor of the application, . . . [the member in question] violated § 8-11 of the General Statutes," that statute did not render the board's reception of his evidence a reason for denying the application. The court found no error and allowed the zone change to stand.
In Daly v. Town Plan Zoning Commission,150 Conn. 495, one of the members of the commission, Overbaugh, was president of a cemetery association which had contracted to sell a portion of its land, zoned residence A, to the Fairfield Broadcasting Company, on the condition that a zoning variance be obtained. Overbaugh appeared before the zoning board of appeals in support of the variance application. After the granting of the variance, the commission held a hearing on a proposed amendment to the zoning regulations to permit the erection of radio towers in residence districts. Overbaugh participated in the hearing and voted to amend the zoning regulations. At page 500, the court held that, clearly, "Overbaugh's appearance before the zoning board of appeals was a violation" of § 8-11. And because of Overbaugh's participation in the action taken, the zone change was held to be invalid. It was in this case that the court brings out (p. 500) that although no "improper influence was exerted by Overbaugh on his associates, and we impute no such influence to him by our decision . . . , [the] evil *Page 440 
lies not in influence improperly exercised but rather in the creation of a situation tending to weaken public confidence and to undermine the sense of security of individual rights which the property owner must feel assured will always exist in the exercise of zoning power."
In Lake Garda Improvement Assn. v. Town Plan Zoning Commission, 151 Conn. 476, the essential facts were that the Lake Garda Company, Inc., the owner of property on the east shore of Lake Garda in Farmington, had applied to the town plan and zoning commission for a change of zone. The chairman of the commission was a member of, and had been a president of, the Lake Garda Company. He participated in the decision granting the zone change to the company which was appealed by the plaintiff Lake Garda Improvement Association. Although he had been requested to withdraw from acting on the zone change, he had refused to do so. The court found this to be a flagrant conflict of interest which rendered the commission's action invalid.
In Josephson v. Planning Board, 151 Conn. 489, a member of the planning board was not found by the trial court to have such a personal or financial interest in the subject matter of the application presented to the board as required him to disqualify himself. But the Supreme Court analyzed the fact situation, pointing out that the real estate agent who had negotiated the sale of the parcel in issue had, for twelve years prior to the hearing on the application, provided the board member with free desk space and telephone service in the real estate agent's office. The issue of the board member's disqualification had been raised prior to and at the public hearing. The court held (p. 494): "The position which . . . [he] occupied placed him squarely in the status proscribed by the decisions of this court — in a situation *Page 441 
tending to weaken public confidence in the proper exercise of the zoning power and in a position where his personal interest might conflict with his public duty. The test is not whether it does conflict but whether it might conflict. Although the question of disqualification was pressed with understandable delicacy and tact, nevertheless it was clearly and seasonably raised." The court found that his failure to disqualify himself invalidated the decision of the planning board.
Kovalik v. Planning Zoning Commission,155 Conn. 497, involved a situation where the chairman of the commission owned 697 acres of land which were upzoned by the commission. Although the chairman had been specifically requested to disqualify himself, he had refused to do so and participated in the decision granting the change. The Supreme Court invalidated the commission's action on that ground.
In issue in RK Development Corporation v. Norwalk,156 Conn. 369, was an application for a certificate of approval by the planning commission, which approved it, transmitting it to the common council for final action. The council denied it. The plaintiff on appeal claimed that a member of the common council had been an active leader in opposing the plaintiff's plan and had testified against it before the commission. His wife had a financial interest in land adjoining that of the plaintiff. The court found that since the council had the ultimate authority to pass on the plans submitted, the councilman's activities in opposition before the planning commission were within the prohibition of the statute. The decision carefully points out that there is nothing in the record to show that any improper influence was actually exerted on his associates on the council and that no such influence was imputed to him. But it held (p. 374): "The trial court, however, *Page 442 
has expressly found that he put himself on record at the hearing before the planning commission with full knowledge that his stated opposition would later be transmitted by the commission to the council." The court found no error.
In Bossert Corporation v. Norwalk, 157 Conn. 279, a member of the common council of Norwalk was also a member of a law firm which represented opponents of the plaintiff's application. Although another member of this firm had appeared, both before the planning commission and common council, in opposition to the plaintiff's application for approval of a proposed residential development plan, the opinion brings out (p. 282) that this same council member sat as majority leader and, on two other occasions when the plaintiff's application was before the council for consideration, as president of the council, and that "[o]n all occasions, however, when the application was being considered by the council, . . . [he] disqualified himself and abstained from voting." Because the conduct of the council member was governed by § 8-21, the counterpart of § 8-11 embracing members of a planning commission, the retention of his law firm to represent the opponents of the plaintiff's application was equivalent to (p. 283) "retaining each member of the firm," and, in view of his membership in the law firm, the court concluded that he "himself was representing the opponents within the meaning of the statute." He did not cease to be a member of the common council by disqualifying himself from the proceedings relating to the plaintiff's application.
In Anderson v. Zoning Commission, 157 Conn. 285, the court found no error in the trial court's decision dismissing an appeal from a change of zone granted by the defendant commission, although the claim was made that two members of the zoning commission *Page 443 
should have disqualified themselves from participating in the decision. The factual situation was that the chairman of the five-member commission had disqualified himself from participating on the application in issue. Just before the hearing was to begin, it developed that one of the commission members was unable to attend, and the chairman, who had already disqualified himself, suggested a possible alternate. That person did participate as an alternate member of the commission in the hearing and decision on the application, and the claim was raised that since he was an employee in the mortgage department of the bank of which the chairman was secretary, he should not have so participated. The same claim was made with reference to another commission member because he was the vice president of a construction company which was represented by a law firm which was also handling the application for a change of zone for the applicants in that case. The opinion makes clear (p. 290) that § 8-11 requires a member to disqualify himself when the decision of the zoning authority could inure to his pecuniary benefit or where he has a personal interest in the outcome. The court further defined what is meant by a personal interest and the way it can be manifested. But on page 291 it takes pains to state this caveat: "Local governments would, however, be seriously handicapped if any conceivable interest, no matter how remote and speculative, would require the disqualification of a zoning official. If this were so, it would not only discourage but might even prevent capable men and women from serving as members of the various zoning authorities. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. They must, however, also be mindful that to abrogate a municipal action on the basis that *Page 444 
some remote and nebulous interest may be present would be to deprive unjustifiably a municipality, in many important instances, of the services of its duly-elected or appointed officials."
On the issue of undue influence, Katz v. Brandon,156 Conn. 521, 535, is also in point, although it involves the taking of land by eminent domain. See also Stocker v. Waterbury, 154 Conn. 446, 453 (involving a member of a parking authority).
In Armstrong v. Zoning Board of Appeals,158 Conn. 158, the zoning commission of the town of Washington had issued a certificate of conformity with the zoning regulations allowing a foundation to erect a school for the education of socially and emotionally maladjusted children under certain restrictions. The commission's decision to grant the permit was appealed to the zoning board of appeals, which, on the record, upheld the granting of the permit. On appeal to the Court of Common Pleas, among the issues raised were claims that both the chairman of the commission and a member of the board should have disqualified themselves from acting in the case. The claim as to the chairman of the commission was that he had (p. 170) "acted in that capacity during consideration of the . . . application while he was also serving as chairman of the Washington mental health fund, in which capacity he had caused a letter to be issued over his signature to all citizens of Washington soliciting funds for mental health causes." As to the member of the zoning board of appeals, the claim was that his son, for a period of about six and one-half years which had terminated prior to the hearing, had received psychiatric treatment at an institution of the foundation in Pennsylvania. The implications made were that these activities predisposed them to favorable action in behalf of the foundation in connection with its application. In the Court of Common Pleas both *Page 445 
officials were examined as witnesses, and the court found that no basis for their disqualification had been established under § 8-11 or in the light of decisions of the Supreme Court interpreting this section. The Supreme Court upheld the trial court's conclusion as to disqualification.
The most recent case which deals with this issue is Fletcher v. Planning Zoning Commission,158 Conn. 497, 505. This involved an appeal from the action of the commission in July, 1966, denying an application for a zoning amendment. "It appeared that two . . . , before becoming members of the commission, had signed a petition opposing the plaintiff's application and that one of these two, who had asked to have his name stricken from the petition before becoming a member of the commission, was also an officer and director of an organization which opposed the plaintiff's application. A third member of the commission had belonged to an organization which opposed the plaintiff's application, but he had not participated in the organization's decision to oppose the application and had resigned from the organization in January, 1966. The first two, after reciting their situation as aforesaid, stated that, any prior expressions of views notwithstanding, they would decide the plaintiff's application on the evidence produced at the hearing having in mind the best interests of the town." The court brought out that although the plaintiff was fully aware of these facts, "no direct challenge to the qualification of any member was made at the hearing before the commission," nor any unequivocal challenge to the qualification of any member to sit on the hearing. The decision reviews the numerous cases dealing with the various ramifications of undue influence under § 8-11, including those hereinabove set out. The court held that the plaintiff should have made his decision at the hearing whether to challenge the *Page 446 
particular commissioners. It is pointed out (p. 508): "Instead of taking forthright action, counsel left to the members of the commission the determination of the question whether they felt themselves to be disqualified. They obviously considered themselves not disqualified and stated that they could and would decide the application on the evidence presented."
These references to the cases cited indicate the development and refinement of our law on this question of compliance with § 8-11. As Anderson v. ZoningCommission, 157 Conn. 285, 291, points out, any decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case.
The plaintiff persuasively tries to sustain its claim that improper influences were brought to bear on the defendant commission by the series of actions and activities involving in one way or another certain members of the thirty-seven-member representative town meeting, hereinafter referred to as the RTM. This issue takes on importance because of the power vested in the RTM to override the action of the zoning commission by a two-thirds vote of the RTM. The plaintiff tabulated in its brief many claims of influence involving these RTM members. At the trial in this court, all the members of the commission who participated in the decision in issue testified at great length on all aspects of the issue of undue influences raised by the plaintiff. All were subjected to rigorous cross-examination.
Because of the unusual factual aspects of this matter and the strong arguments submitted by the plaintiff in its brief, this court has made an analysis of the evidence as to undue influence on the commission, based on the court's reading of the 800 pages of transcript of the public hearings and of the evidence adduced at the trial. Of primary importance is *Page 447 
the fact that the court had the opportunity to hear the testimony of the five commission members at the trial and to observe each individually and weigh his testimony. The credibility of these witnesses is particularly a matter for the court's determination as an issue of fact. These commissioners appeared to be highly intelligent people of standing in their community who clearly had devoted many hours of unpaid public service to hearing and passing on a most controversial zoning matter. The court must accept their testimony that the various individual acts claimed by the plaintiff did not, in their cumulative effect, constitute direct or indirect undue influence on the commission members and did not prevent them from holding public hearings with complete impartiality and an open mind, nor from deliberating and arriving at their decision with the same impartiality. The court has examined particularly the various claims of undue influence relating to the RTM members.
The analysis made of the testimony of the commission members shows that they had scant knowledge of the activities of the opposition group and no knowledge of individual contributors. As to the various letters and petitions submitted, the court must accept the testimony of the commission members that they considered them mainly as to volume, without individual particularization as to signatures in favor or against. It is significant that the plaintiff also resorted to the solicitation of signatures on petitions, not only of businessmen favoring the project but also of owners of property in Westport generally. Although the plaintiff seeks bit by bit to spin a web of undue influence composed of letters, petitions, RTM memberships, articles to newspapers, and political advertisements, this court must conclude that the plaintiff has failed to sustain its burden of proof as to these claims. *Page 448 
The court, therefore, specifically finds that the plaintiff has failed to sustain its burden of proof that there was any evidence of a conflict of interest or of any personal interest, pecuniary or otherwise, on the part of any of the members of the defendant commission or that any of the members placed themselves in positions where their personal interest might conflict with their public duty or in a position tending to weaken public confidence in the fair and impartial exercise of the zoning powers vested in them. Nor can the court find that the plaintiff has sustained its burden of proving that the commission acted on the basis of any improper motive in denying the application.
Likewise as to the other issues raised, confiscation, restraint of trade, and reverse spot zoning, the court must also conclude that the plaintiff has failed to sustain its burden of proof.
The minutes of the executive session of the defendant commission denying the application and special permit show that the commission was concerned that a regional shopping center of the proposed B. Altman Company size would be "undesirable as the traffic generation would cause continual congestion on all roads leading to the location." The main basis of the opposition, not only of the group which was represented by counsel and presented expert witnesses but also of the individual opponents, all centered on the question of congestion and the traffic hazards which they believed would result from this project. It is true that the plaintiff presented unusually detailed reports — of traffic studies made by several outstanding traffic consultants — claiming that the project was feasible with regard to traffic considerations, but this evidence was subject to the test of credibility and its acceptance by the commission. It was in no whit different from deciding an issue of fact involving expert testimony *Page 449 
of doctors or other experts in a trial. The traffic expert presented by the opponents raised many grave traffic questions in the light of his analysis and study of the situation. Implicit in the proposed plans of the applicant to avoid and minimize traffic congestion was the fact that many unusually substantial changes would have to be effected on East State Street and North Compo Road by the applicant, with the cooperation and permission of the state traffic and highway authorities, not only as to highway layouts and widening but also as to signal light installations. It is significant that in all the voluminous testimony no solid tangible evidence was presented as to what the state traffic and highway authorities were committed to do to make this project viable from a traffic standpoint. The opponents' traffic expert raised considerable doubt as to the order of priority which the state highway department was prepared to give to highway improvement projects planned for this area and involving particularly East State Street and North Compo Road.
The salient aspect of the traffic situation involved herein is that it affects the very center of the town of Westport. And in this regard some of the testimony at the public hearing that most large stores construct their shopping center branches in peripheral areas, where there is easy accessibility to main highways, takes on considerable significance. In the instant case accessibility to the main highways such as the Merritt Parkway or the Connecticut Thruway was definitely a matter for the commission to weigh.
It is apparent that the commission decided the traffic issue on the basis of the conflicting evidence. On the evidence as a whole, this court must find that the commission made a determination of land use policy involving the volume, control and burden of *Page 450 
traffic and that the plaintiff has failed to sustain its burden of showing that such land use, as presently zoned, is not consistent with the best interest of the general welfare and prosperity and development of the community as a whole. Willott v. Beachwood,175 Ohio St. 557, 560. The cited case further points out: "The determination of the question of whether regulations prescribed by a zoning ordinance have a real or substantial relation to the public health, safety, morals or general welfare is committed, in the first instance, to the judgment and discretion of the legislative body. Where such a judgment deals with the control of traffic, volume of traffic, burden of traffic, effect upon valuation of property, municipal revenue to be produced for the city, expense of the improvement, land use consistent with the general welfare and development of the community as a whole, or, in short, where the judgment is concerned with what is beneficial or detrimental to good community planning, it is in the first instance a legislative and not a judicial matter."
In summary, therefore, this court must hold as follows: (1) Although the issue of aggrievement was not in dispute, this court finds specifically that the plaintiff applicant is the owner of the subject parcel and therefore is an aggrieved party entitled to appeal. (2) the reasons set forth by the defendant commission, in the light of all the evidence taken, were adequate to support its conclusions. (3) The action taken by the commission in denying the plaintiff's application was not in restraint of trade, nor was it beyond the scope of the authority of the commission. (4) The denial of the plaintiff's application by the commission did not constitute reverse spot zoning. (5) The action of the commission denying the plaintiff's application was not confiscatory. (6) The claimed activities of members of the representative town meeting, in the light of all the *Page 451 
circumstances involved and the applicable law, did not constitute improper and undue influence on the commission; nor did the actions of members of the RTM and the chamber of commerce and of other individuals opposing the plaintiff's application create an atmosphere which unduly influenced the commission.
In the language of Willott v. Beachwood, supra: "On the basis of the record in this case, the question before the council was a fairly debatable one, and it cannot be seriously contended here that its action was so arbitrary, confiscatory and unreasonable as to be in violation of constitutional guaranties."
In arriving at its decision, the court has taken into account its personal observation, in the company of opposing counsel, of the subject parcel and the surrounding streets and highways, with particular reference to traffic layout.
 This court, therefore, finds and concludes that the plaintiff has failed to sustain its burden of proof to show that the defendant commission acted illegally, arbitrarily or in abuse of its discretion, and the appeal, therefore, is denied and dismissed.