[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. History of the Case:
These two appeals were consolidated by the court, Cioffi, J., on December 18, 1989. Plaintiffs in the first action ["Constas v. PZC"], Harry T. Constas.[1] Mary T. Kinahan, Edward C. Bloom and Eleanor S. Bloom, appeal from the decision of the defendant Greenwich Planning and Zoning Commission [the "Commission"] granting the application of defendant Brunswick School, Inc. [Brunswick" or the "Applicant"] for preliminary site plan approval for a project on Brunswick's Maple Avenue property known as the Lower School. Plaintiffs in the second action ["Kinahan v. PZC"], Mary T. Kinahan, Edward C. Bloom and Eleanor S. Bloom, appeal from a subsequent decision of the defendant Commission granting the application of defendant Brunswick for a special permit and final site plan approval for the same project.
By application dated April 25, 1989, Brunswick applied to the Commission for preliminary site plan approval to construct a 10, 663 square foot addition and two (2) faculty apartments on its Maple Street property, referred to as the Lower School, which is located in an R-20, "Single Family Residence 20,000 square feet", zone. (Record I, Item 1, Application; Item 2, Affidavit and Exhibits; Item 44, Building Zone Map.)[2] See Greenwich Building Zone Regulations, section 6-2, 6-13 (November 1986, amended to November 30, 1988) (Record I, Item 43; Record II, Item 53) [the "Regulations"]. The application also indicated that the total number of parking spaces on the property would be reduced by three (3) from 57 to 54. (Record I, Item 1.) By letter dated April 27, 1989, Brunswick requested a special permit, a requirement under section 6-101 of the Regulations when new construction will result in a structure(s) in excess of 150,000 cubic feet in volume above established grade in an R-20 zone. (Record I, Item 5, Letter, 4/27/89.) Regulations, section 6-101.
Public hearings on Brunswick's application were held on June 6, 1989 and June 27, 1989. (Record I, Items 10, 15, Legal Notices; Items 14, 21, Transcripts.) At its regular meeting on August 8, 1989, the Commission voted to deny without prejudice Brunswick's application for a special permit but to advise Brunswick to proceed to a final site plan subject to specific modifications to be resolved prior to submission of an application for final site plan approval and a reapplication for a special permit. (Record I, Item 25, Legal Notice; Item 27, Letter of Decision.) Notice of the Commission's denial of the special permit was published on August 16, 1989. (Record I, Item 25.) Plaintiffs in Constas v. PZC challenged the resolution and decision of the Commission granting Brunswick's application for preliminary site plan approval and advising Brunswick to proceed CT Page 1000 to a final site plan.
By letters dated September 13, 1989 and September 14, 1989, and by application dated September 13, 1989, Brunswick reapplied to the Commission for a special permit and applied for final site plan approval to construct the 10,663 square foot addition and two (2) faculty apartments. (Record II, Item 1, Letter, 9/13/89; Item 2, Application; Item 12, Letter, 9/14/89.) This application also showed a reduction in parking spaces from 57 to 54. (Record II, Item 2.)
A public hearing was held on Brunswick's application on October 12, 1989, following the Commission's regular meeting. (Record II, Item 17, Legal Notice; Item 18, Transcript; Item 44, Minutes, 10/12/89.) At the close of the public hearing on October 12, 1989, the Commission's regular meeting was reconvened and the Commission approved the requested special permit and final site plan with specified modifications to be "resolved prior to the issuance of a building permit unless otherwise noted." (Record II, Item 44; Item 43, Letter of Decision.) Notice of the Commission's decision to approve the special permit and final site plan was published on October 19, 1989. (Record II, Item 42, Legal Notices.) Plaintiffs in Kinahan v. PZC appeal the decision approving the special permit and final site plan.[3] At the hearing on appeal, June 27 and 29, 1990, the court, Leheny, J., found plaintiffs to be aggrieved.
II. Aggrievement
The Court has subject matter jurisdiction in this appeal. Procedural irregularities caused Harry T. Constas to withdraw as Plaintiff but he remained as counsel of record for the other Plaintiffs. (See Zoarski, et al. v. Branford Planning and Zoning Commission et al., 15 CLT 48.)
III. Issues
Plaintiffs and Brunswick have submitted a total of nine (9) briefs bearing the docket numbers and addressing the merits of Constas v. PZC or Kinahan v. PZC or both. The Commission has adopted Brunswick's briefs dated February 5, 1990 and April 4, 1990. Plaintiffs raise the same issues in both appeals. Floor Area Ratio/Merger
Plaintiffs first argue that Brunswick's proposal violated the floor area ratio ["FAR"] limitation applicable to an R-20 zone. The Regulations define FAR as "the ratio of the floor area . . . of a building to the total lot area on which the building is located." Regulations, section 6-5 (a)(23). The FAR in an R-20 zone is .25. Regulations, section 6-205 (a). A lot is defined as "a parcel of CT Page 1001 land occupied or to be occupied by a building or group of buildings and their accessory uses, including such open spaces as are required by these regulations and such other open spaces as are used in connection with the buildings." Regulations, section 6-5 (a)(33).
Plaintiffs claim that the property referred to as the Lower School and described as extending between Maple and Maher Avenues is made up of four (4) lots, each subject to a 25% FAR limitation, and that Brunswick is attempting to "transfer" the right to build on 25% of each of the smaller lots, now only containing faculty residences and a business office, to the lot on which the school building is located. Plaintiffs argue that no merger of said four (4) lots has occurred and that it may not occur because residential property may not merge with school property. Plaintiffs cite no authority for this proposition.
Defendants respond that the four (4) parcels are one lot, as that term is defined and used in the Regulations, that the boundary lines disappeared for zoning purposes that all buildings thereon are principal educational uses, or, in the alternative, permitted accessory uses, and that each parcel was granted special exception status as a non-profit educational use. Defendants claim that the facts support a finding that merger has occurred, and therefore, Brunswick's proposal satisfied the FAR limitation.
"[C]ontiguous land owned by the same person does not necessarily constitute a single lot." Marino v. Zoning Board of Appeals, 22 Conn. App. 606, 609 (1990) (citing Molic v. Zoning Board of Appeals, 18 Conn. App. 159, 164-65 (1989)); Schultz v. Zoning Board of Appeals, 144 Conn. 332, 338 (1957). Also, the "taxation of multiple parcels of land by the assessor's office as one tract does not compel a finding of merger." Marino, supra at 609. Similarly, "the fact that a deed description references multiple lots from a map filed in the land records does not compel a finding of an absence of merger." Id. However, these factors may be considered by the local authority "as part of the evidentiary foundation to support a finding of merger if they are relevant and probative." Id. It is a "basic proposition that in a determination of the factual issue of merger, the intent of the property owner must be ascertained and that no single factor is dispositive." Id. at 610 (citing Molic, supra at 164.)
"An owner of contiguous parcels of land may merge those parcels to form one tract if he desires to do so." Molic, supra at 164. "An intent on the part of the owner to do so may be inferred from his conduct with respect to the land and the use which he makes of it." Id. "Intent is a question of fact." Id. (citation omitted). Also, "some zoning regulations . . . require either expressly or implicitly, that under certain conditions a CT Page 1002 non-conforming lot merges with contiguous land owned by the same owner." Id. (citing, inter alia, Neumann v. Zoning Board of Appeals, 14 Conn. App. 55, 60, cert. denied, 208 Conn. 806
(1988)); See Regulations, section 6-9.
"Once a local zoning authority has found or could have found, from the record before it, that there was a merger of lots, the trial court is "restricted to a determination of whether the board's finding of merger was reasonably supported by the record. . . ." Marino, supra at 608 (citing Horn v. Zoning Board of Appeals, 18 Conn. App. 674, 677 (1989)). "A trial court cannot disturb a zoning board's factual finding of merger as long as that finding is the product of an honest judgment reasonably exercised. To do so would be an improper substitution of the trial court's judgment for that of the board." Id. (citation omitted.)
At the first hearing on the preliminary site plan, held on June 6, 1989, Brunswick's attorney presented, orally, the following history of the subject property: The Maple Avenue portion of Brunswick's property was a girls' school called the Greenwich Academy from 1916 to 1966. For between one (1) and three (3) years following 1966, the Maple Avenue portion was used by the Educational Records Bureau, which later, in 1970 or 1971, sold it to Brunswick. Since 1971, Brunswick has operated the Lower School on the Maple Avenue parcel. (Record I, Item 14, pp. 3-4.) Counsel continued:
 The Brunswick in 1970 took this over as the lower school, some of the older buildings and what was left of the old Century Hall, which is still there which was used for housing and they built what is known as Stevenson Hall, which is a one-story building which is presently on the campus. Gradually the lower school increased from 90 students and 10 faculty in 1971 to 141 students and 15 faculty at the present time. The campus became expanded and grew to Maher Avenue, where the headmaster's property was purchased with a cottage adjoining the headmaster's cottage which is faculty housing when the business office was moved to this house basically facing on Maher Avenue and that's where the faculty housing units are and the two housing units are in the other building. The rest of the property is playground and open space. The present use of the property is for grades 1 through 5 (indicating).
(Record I, Item 14, pp. 4-5.) (See also Record II, Item 45, Site Plan, Revised 9/11/89.) The site plans show the location of the four parcels, the school parcel on the westerly side of Maple CT Page 1003 Avenue and the three (3) after-acquired parcels on the easterly side of Maher Avenue. (Record I, Item 37; Record II, Item 45.)
The plans originally submitted to the Commission showed that Brunswick calculated the total permitted building area by adding the acreage of the four (4) parcels and multiplying the total acreage by the .25 FAR (3.694 acres, which is 160,910.64 square feet, multiplied by .25 equals 40,227.66 square feet.) Brunswick then calculated the building area remaining on the property by subtracting the total area of the existing building on all four (4) parcels from the total permitted building area (40,277.66 minus 27,952.51 equals 12,275.15 square fee.) Since the remaining building area (12,275.15 square feet) is greater than the area of the proposed additions (10,663 square feet), the project is well within the FAR limitation, if indeed the parcels have merged. (Record I, Item 34-E and Record II, Item 51-0, FAR Summary, dated 4/24/89.)
Plaintiffs admitted that if the acreage of the four (4) parcels could be used to calculate the total building area, Brunswick's proposed additions would be within the FAR limitation. (Record II, Item 18, p. 36.) However, plaintiffs argue that the three (3) parcels on the easterly side of Maher Avenue cannot be included in the total building area because special exceptions to operate a school on those parcels were never obtained. Plaintiffs maintain that residential property may not be merged with school property. (See Record I, Item 16, Letter and Exhibits submitted to Commission by Constas.) Plaintiffs submitted copies of tax assessor's cards showing that each of the four (4) parcels was assessed separately and has a difference address. (Record I, Item 16, Exhs. A, B-1, B-2, B-3.) Plaintiffs admit that all four (4) parcels are tax exempt but argue that this is not so because they are part of the school parcel but because they are owned by a not for-profit, tax-exempt owner. Plaintiffs also point to the fact that the parcels were acquired at different times, and that separate applications were made to the Board for each parcel (discussed below). Plaintiffs submitted documents showing that the Board approved a special exception in September 1970 for the Maple Avenue parcel authorizing its use for a school. (Record I, Item 16, Exh. F.) In January, 1972, the Board authorized an addition to the school building "and use of [a] walkway crossing [the] residential property [to Maher Avenue]." (Record I, Item 16, Exh. 16-I.) Presumably, the purpose of this exhibit is to show that the Board characterized the property on the easterly side of Maher Avenue as residential.
However, later in March, 1972, the Board authorized as a special exception the conversion of an existing one-family dwelling on the northern most parcel on the Easterly side of Maher Avenue to provide quarters for two faculty families "as an CT Page 1004 accessory use to a private non-profit school. . . ." (Record I, Item 18-B, pp. 1-2, 4, 5, and Record II, Item 24, pp. 4-5, 7, 8, Appeal #5118.) This decision was amended by the Board in 1987 to "permit addition to dwelling (existing faculty housing) accessory to non-profit school . . . special exception standards hav[ing] been met under Sections 6-19, 6-20, and 6-94 (a)(5) of the . . . Regulations." (Record I, Item 18-B, pp. 1-2, 4, 7; Record II, Item 24, pp. 4-5, 7, 10, Appeal #7207.)
In June, 1974, the Board granted a "variance of yard requirements and [authorized] a special exception to permit garage building to be converted to a one-family dwelling for faculty housing on the easterly side of Maher Avenue." (Record I, Item 18-B, pp. 1-2, 4, 9; Record II, Item 24, pp. 4-5, 7, 12, Appeal #5455. This is the southernmost parcel on the easterly side of Maher Avenue which contains the headmaster's dwelling. (Record I, Item 18-B, pp. 1, 4; Record II, Item 24, pp. 4, 7.) The site plans show the converted garage as a "cottage". (Record I, Item 37, Record II, Item 45.) This parcel was also the subject of another appeal in August, 1982, in which the Board granted "a special exception . . . to permit addition to dwelling for faculty housing, on the easterly side of Maher Avenue . . . the standards hav[ing] been met under Sections 6-19, 6-20 and 6-94 of the . . . Regulations. . . ." (Record I, Item 18-B, pp. 1-2, 4, 8; Record II, Item 24, pp. 4-5, 7, 13, Appeal #6563.)
In May, 1978, the Board granted "a special exception to permit use of an existing dwelling for administrative uses of a non-profit educational institution . . . under Sections 6-94, 6-19, and 6-20 of the . . . Regulations . . ." for the middle parcel on the easterly side of Maher Avenue. (Record I, Item 18-B, pp. 1-2, 4. 10; Record II, Item 24, pp. 4-5, 7, 11, Appeal #6047.) Defendant also points out that the tax assessor's cards for the three (3) parcels on the easterly side of Maher Avenue list them all as "Property Class 6/50", which class is "EXEMPT, owned by Bd. of Education." (Record I, Item 18-C, Record II, Item 24, pp. 14-18.
Section 6-19 (a)(4)(A) of the Regulations gives the Board the power to "[d]ecide requests for special exceptions . . . wherever special exception is authorized in these regulations. . . ." Section 6-94 (a)(5) provides:
 (a) The following uses shall be permitted in . . . R-20 . . . zones when authorized by the Board . . . as special exceptions:
. . .
 (5) Churches, educational institutions not operated for commercial profit.
CT Page 1005
Section 6-20 (c) of the Regulations sets forth the conditions and standards which must be met prior to the granting of a special exception.
Thus, in granting the appeals discussed above (appeals 5118, 7207, 5455, 6563 and 6047) under section 6-94 (a)(5), the Board authorized the use of the three (3) parcels on the easterly side of Maher Avenue as part of a non-profit educational institution.
In response to plaintiffs' argument that the residential and school parcels may not be merged, and because, as Brunswick phrases it, "[n]o special exception was sought or granted with respect to the actual residence of the Headmaster" (Record I, Item 18-B, p. 1; Record II, Item 24, p. 4), Brunswick submitted an alternate or revised FAR Summary which excludes the headmaster's dwelling and 20,000 square feet of property attributable to that dwelling from its FAR calculations. The result was a reduction in the maximum area for additions to 10,910.91 square feet, still in excess of the proposed 10,663 square foot addition. (Record I, Item 18-B, pp. 1-3; Record II, Item 24, pp. 4-6.)
However, there is no evidence that Brunswick subdivided the southern parcel containing the headmaster's dwelling and the cottage/faculty dwelling. Brunswick attributed 20,000 square feet to the headmaster's dwelling presumably because the property lies in an R-20 zone, which requires 20,000 square feet per lot; regulations, section 6-2; but the 20,000 square-foot figure is otherwise arbitrary. (See Record I, Item 18-B, p. 2; Record II, Item 24, p. 5.) There is no indication where, on the southern parcel, the 20,000 square feet is located except that it would include the headmaster's dwelling, or whether it would separate the cottage from the remaining parcels such that the land on which the cottage sits would no longer be contiguous to the parcels with which it was supposed to have merged. Therefore, the alternate or revised FAR Summary has no basis in fact or in law.
However, when the Board approved a special exception allowing the conversion of the garage (now "cottage") to faculty housing on the southern parcel, the special exception was not limited to the garage/cottage itself, but affected the use of the whole parcel. Special exceptions relate to the land and permit particular uses of the land not particular uses of structures. 3 Anderson, American Law of Zoning 3d, section 21.01, pp. 631-33, section 21.02, p. 633 (1986 Dec. 1989 Supp. ) Special exceptions, like all provisions in local zoning ordinances, attach to and run with the land. Id. at section 21.01, Supp. p. 102 (citation omitted); Garibaldi v. Zoning Board of Appeals, 163 Conn. 235, 239 (1972) (discussing variances); see also Conn. Gen. Stat. ss. 8-3d (rev'd to 1989) (special permits and exceptions and variances must be CT Page 1006 recorded in the land records to be effective).
In granting the special exception, the Board necessarily allowed not only the conversion of the garage but a use of the parcel other than that for which it was zoned (i.e. it allowed two dwellings in a single family zone). The parcel was no longer governed by the R-20 restriction; the special exception necessarily authorized the existence of both the headmaster's dwelling and the cottage/faculty dwelling on the same parcel. In other words, the Board allowed the use of the parcel for faculty dwellings as part of a non-profit educational institution. The fact that a building, the garage/cottage, already existed on the land, and therefore, that the application and authorization were phrased in terms of allowing a particular use of that building, does not alter the fact that the special exception relates to the use of the land.
Therefore, the record shows that the three (3) parcels on the easterly side of Maher Avenue received a special exception under section 6-94 (a)(5), which allows non-profit educational institutions in an R-20 zone, and, therefore, that a merger of the four (4) parcels would not constitute a merger of school and nonschool property. These facts, as more fully discussed above, show "an integrated and interdependent usage" of the four (4) parcels and could reasonably support a finding of intent to merge the four (4) parcels such that the Commission's acceptance of the original FAR calculations submitted by Brunswick cannot be said to have been arbitrary, illegal or in abuse of its discretion. See Marino, supra at 608, 610; see also Regulations, section 6-5 (a)(33) (definition of "lot"). Proposed Faculty Apartments
Plaintiffs also contend that regardless of whether the four (4) parcels have merged, the addition of two faculty apartments to the principal Lower School building as proposed would be in violation of the Regulations in that (1) the property containing the School is in an R-20, single family residence zone and already contains at least one single family residence; (2) a "special permit authorizing Brunswick to operate a school in a residential zone does not give it the right to also build apartments"; (3) in an R-20 zone, each residence requires 20,000 square feet of land; and (4) the proposed faculty apartments are not permitted accessory uses. However, as noted by defendants, the plaintiffs confuse a special permit with a special exception under the Regulations and confuse the authority of the Commission with the authority of the Board.
Where, as in the instant case, proposed construction will result in a structure(s) in excess of 150,000 cubic fee in volume above established grade, in addition to site plan approval, the CT Page 1007 applicant must also obtain a special permit from the Commission. Regulations, section 6-13, 6-101. Section 6-17 of the Regulations authorizes the Commission to approve such special permits and sets forth the standards which must be met prior to approval. As already noted, the Board, on the other hand, has the authority to issue special exceptions authorizing the use of property in a R-20 zone for educational institutions not operated for commercial profit. Regulations, section 6-19 (a)(4)(A), 6-94 (a)(5).
Following the Commission's approval of the preliminary site plan, and pursuant to a condition attached to that approval (Record I, Item 11-A, Comments of Zoning Enforcement Dept.; Record I, Item 27; Record II, Item 9, Letter of Decision), Brunswick applied to the Board for a special exception under section 6-94 (a)(5) of the Regulations. (See Record I, Item 14, p. 2; Record II, Item 33, Minutes of the Board's meeting, 9/20/89.) The Board granted the special exception permitting the proposed additions and alterations, including the two faculty apartments, under 6-94 (a)(5). (Record II, Items 32, Letter of Decision; Item 33.) As discussed above, in prior years, the Board also authorized by special exception the use of the parcel on the westerly side of Maple Avenue for the Lower School and the three (3) parcels on the easterly side of Maher Avenue for faculty dwellings and/or offices as accessory uses to the School. (Record I, Item 18-B; Record II, Item 24.)
Thus, in the past and with regard to the two faculty apartments challenged now by the plaintiffs, permission to use the property for faculty housing has been obtained from the Board, not the Commission. Indeed, the Office of Zoning Enforcement specifically stated that the "additions and faculty housing must be authorized by the . . . Board as a special exception." (Record I, Item 11-A.) 3. The Commission did not issue, nor does it have the power to issue such special exceptions. See Regulations, section 6-94 (a). The fact that the Commission has the power under section 6-94 (b) to authorize certain uses as special permits while the Board has the power to issue the special exception requested by Brunswick under section 6-94 (a), supports the conclusion that the Regulations are intended to empower the Board, and only the Board, with the right to authorize the use for which Brunswick sought approval.
Although section 6-17(a) of the Regulations, which governs the issuance of special permits by the Commission, requires that the Commission "determine that the proposed use conforms with the overall intent of [the] Regulations and the purposes of each zone," where the proposed use itself must be authorized by the Board as a special exception, the Commission satisfies the requirement of section 6-17(a) at the preliminary site plan stage by requiring the Applicant to obtain the necessary approvals from CT Page 1008 the Board before reapplying for a special permit and applying for final site plan approval. (Record I, Item 27; Record II, Item 9.) At the final site plan stage, the Commission may properly rely on the Board's finding that the use is permitted as a special exception. Nowhere in the regulations is there a provision allowing the Commission to overturn or override a special exception granted by the Board.
Therefore, the challenge to the two faculty apartments proposed must be made in an appeal from the Board's decision granting a special exception and may not be raised in these appeals from the Commission's decision.
Predisposition of Commission
Plaintiffs also argue that the Commission was "prejudiced and predisposed" to grant Brunswick's applications. Plaintiffs claim that such prejudice is evidenced by the Commission's acceptance of an "implausible solution" to traffic concerns. They also argue that the Commission's acceptance of testimony and written material from Brunswick concerning the savings to the Town and taxpayers resulting from an increase of students at private schools (Record I, Item 13-C; Item 14, p. 43) was prejudicial, had no bearing on the merit of Brunswick's application, and should have been rejected. Plaintiffs argue that the failure to reject said evidence tainted the proceedings and deprived opponents of a fair hearing. They assert that once Brunswick improperly solicited favorable consideration of its application based on savings to taxpayers and, therefore, savings to the members of the Commission, each member should have disqualified him or herself under section 8-11 of the General Statutes. Plaintiffs go on to argue that Brunswick "misled" the Commission by presenting "false testimony as to the illegal enrollment it had knowingly permitted and that under the circumstances, "an unprejudiced Commission would have been suspect of the unorthodox request of faculty apartments within the school ordinarily suspecting this was a means of increasing the size of the school so as to exceed the new [enrollment] limits, as had been the practice in the past." Plaintiffs claim that the Commission's prejudice is also evidenced by its approval of the application in violation of the. 25 FAR limitation. Plaintiffs also assert that prejudice and predisposition may be proved by circumstantial evidence, although they cite no authority to that effect, and state that there "were too many circumstances and facts concerning the Brunswick application that defied logic and called for contrary conclusions as to compliance with required standards. Collectively considered they provide circumstantial evidence of prejudice and predisposition."
Section 8-11 of the General Statutes provides, in part, that CT Page 1009 "[n]o member of any zoning commission or board and no member of any zoning board of appeals shall participate in the hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense." Conn. Gen. Stat. section 8-11
(rev'd to 1989). Section 8-11 "requires a member of a zoning commission . . . to disqualify himself when the decision of the zoning authority could enure to his pecuniary benefit." Anderson v. Zoning Commission, 157 Conn. 285, 290 (1968) (citations omitted but discussed below). Section 8-11 "also forbids a member of a zoning commission . . . from participating in any matter in which he has a personal interest in the outcome. Id. (citation omitted). "A personal interest is either an interest in the subject matter or a relationship with the parties before the zoning authority impairing the impartiality expected to characterize each member of the zoning authority." Id. "A personal interest can take the form of favoritism toward one party or hostility toward the opposing party; it is a personal bias or prejudice which imperils the open-mindedness and sense of fairness which a zoning official in our state is required to possess." Id. at 290-91.
"Local governments would, however, be seriously handicapped if any conceivable interest, no matter how remote and speculative, would require the disqualification of a zoning official. If this were so, it would not only discourage but might even prevent capable men and women from serving as members of the various zoning authorities." Id. at 291. "The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case." Id. (citation omitted); see also Thorne v. Zoning Commission, 178 Conn. 198, 204-5 (1979).
"[A] charge of bias must be supported by some evidence proving probability of bias before an official can be faulted for continuing to execute her duties." Obeda v. Board of Selectmen,180 Conn. 521, 523-34 (1980). The plaintiff bears the burden of proving a conflict of interest, or personal interest, pecuniary or otherwise. Second Norwalk Corporation v. Planning Zoning Commission, 28 Conn. Sup. 426, 447-48 (C.P. 1969). "The law does not require that members of zoning commissions must have no opinion concerning the proper development of their communities. It would be strange, indeed, if this were true." Furtney v. Zoning Commission, 159 Conn. 585, 594 (1970).
Plaintiff cites no decisions in which the courts have held that commissioners should have been disqualified as having a pecuniary interest where that pecuniary interest takes the form of savings to all taxpayers, nor has research revealed any such decisions. In decisions where the courts have held that a commissioner had a disqualifying pecuniary interest, that interest CT Page 1010 was of a different nature. For example, Josephson v. Planning Board, 151 Conn. 489 (1964), involved a planning board member who received free desk space and telephone service in the office of a realtor who sold the subject property to the applicant. The sale to the applicant was contingent on the planning board's approval. The arrangement between the realtor and board member was for the mutual convenience of the realtor and the board member's employer, an insurance company. In this association, the board member had had two hundred (200) or more mortgage transactions with the realtor on the realtor's sales. The court concluded that the member should have been disqualified under section 8-21, the equivalent of section 8-11 for planning boards, and that the action of the board was invalid. Id. at 494-495.
In Lake Garda Improvement Assn. v. Town Plan Zoning Commission, 151 Conn. 476 (1964), the court held that the chairman of the commission should have been disqualified from acting on a company's request for a zone change. The chairman had purchased some of the property from the company while its application was pending. He also had friendship and business dealings with the dominant figure of the company and was associated with groups antagonistic to one of the opponents of the zone change.
Similarly, in Mills v. Town Plan Zoning Commission,144 Conn. 493 (1957), the court found that one of the commission members had a disqualifying interest in the plaintiff's application for a zone change so that a regional shopping center could be developed on her land; the commission member feared that the center proposed by plaintiff would adversely affect the plans of another company to develop a center nearby. The commission member had various real estate dealings with an owner of forty (40) percent of the stock in the other company and had been appointed to the commission by an owner of another forty (40) percent of the stock of the other company. See also East Street Residential Partnership v. East Granby Planning and Zoning Commission, 1 CTLR 303 (June 11, 1990) (commission member who owned property across the street from the applicant's property should have disqualified himself under section 8-11); Gill v. Zoning Commission of the Noank Fire District, 2 CSCR 654
(May 22, 1987, Hurley, J.) (chairman's father was employee of applicant and moored his boat at the marina sought to be enlarged by applicant). As discussed below, Brunswick proposed to move the entranceway to the school to eliminate a queue of cars on Maple Avenue. (Record I, Item 9, Traffic Study, pp. 11-12; Item 14, pp. 28-9; Record II, Item 21, Traffic Study, pp. 11-12.) Plaintiffs argue that this is an "implausible solution" and that the Commission's acceptance of it is evidence of prejudice. However, in making this argument, plaintiffs are simply arguing that the Commission's determination that Brunswick's proposal complies with the Regulations in terms of traffic considerations is not CT Page 1011 supported by the evidence in the record. Even if a local agency's decision is ultimately found not to be supported by the record, a finding of prejudice does not automatically follow.
As to the evidence presented concerning the tax savings resulting from a decrease in enrollment in public schools and an increase in enrollment at private schools, the possible tax effect of a decrease in public school enrollment is common knowledge and no doubt would be known to the Commission members even absent the challenged evidence. If Plaintiffs' argument were accepted, the fact that all citizens are taxpayers would mean that no residents of Greenwich would be able to sit on the Board to hear Brunswick's application or any other application which arguably would reduce or increase local taxes. Furthermore, plaintiffs themselves stated that they figured the savings to each taxpayer to be only $3.00 per year. (2nd Supp. Record I, only item.) Any personal or financial interest which the Commission members had as a result of the fact that they are also taxpayers does not rise to the level of personal or pecuniary interest requiring disqualification under the authorities cited and discussed above.
Also, proceedings before local authorities are informal and conducted without strict adherence to the rules of evidence. Pizzola v. Planning Zoning Commission, 167 Conn. 202, 207
(1974). "[T]here is a strong presumption of regularity in the proceedings of a public body such as a municipal planning and zoning commission. (Citations omitted.) Even if that presumption is rebutted, however, `not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice must be shown.' (Citations omitted.)" Murach v. Planning Zoning Commission,196 Conn. 192, 205 (1985). The record does not establish that this evidence formed the basis of the Board's approval; Second Norwalk Corporation, 28 Conn. Sup. at 430; or that it in any way affected the decision; Murach, supra at 206. It was not mentioned by the Commission in its decision or in the minutes of the meeting at which the Commission voted to approve the applications. (Record I, Item 27; 1st Supp.; Record I, Item D; Record II, Items 43, 44.) To assume that it formed the basis of the decision where this is not borne out by the record would constitute error. Second Norwalk Corporation, 28 Conn. Sup. at 430.
Regarding plaintiffs' claim that an unbiased Commission would have denied the applications because Brunswick "misled" the Commission as to its enrollment figures, there is evidence in the record that Brunswick increased its enrollment in the Lower School to 141 and then to 160 even though the Board had previously limited enrollment to 125 in a prior appeal. (Record I, Item 14, p. 4; Item 16, Exh. I; Record II, Item 18, p. 34.) However, the fact that enrollment exceeded 125 was also made clear to the CT Page 1012 Commission before it rendered its decisions. (Record I, Item 14, pp. 49, 56-8, 77-8; Record II, Item 18, p. 34.) Also, the enrollment caps had always been the province of the Board, not the Commission. (Record I, Item 16, Exhs. F, G, I; Record II, Items 32, 33.) Prior to the Commission's grant of final site plan approval, the board granted relief from its prior imposed enrollment limitation and authorized a new limitation of 515 students for Upper, Middle and Lower Schools combined, conditioned on submission by Brunswick of certification of the student enrollment to the Zoning Enforcement Officer on the first day of October each year. (Record II, Items 32, 33.) Thus, the issue of enrollment caps was addressed by the Board and the caps are to be enforced by the Zoning Enforcement Officer.
Furthermore, absent a specific standard authorizing the zoning authority to consider such matters, the zoning authority may not deny an application on the ground that the application violated conditions attached to a prior permit. 3 Anderson, supra p. 1, section 21.25. The Regulations do not list prior compliance with permits issued by other local boards as a factor to be considered in granting site plan approval or special permits. See Regulations, section 6-15, 6-17. Nor may an application be denied based on anticipated violations. 3 Anderson, supra p. 11, section 21.25. "The Board is not required to anticipate that the applicant would later violate the zoning regulations by a use not authorized . . . and should such a violation occur, the ready remedy is by legal action at that time." Miklus v. Zoning Board of Appeals, 154 Conn. 399, 402 (1967). Therefore, the Commission neither had the power nor a reason to deny Brunswick's application based on evidence concerning prior enrollment.
Plaintiff also contends that prejudice is shown because the Commission approved applications which violate the FAR limitation. However, it has already been found that the record supports a conclusion that the FAR limitation was not violated.
Therefore, the evidence does not demonstrate that the Commission was prejudiced or predisposed to grant Brunswick's applications.
Traffic and parking
Plaintiffs also argue that the application should not have been approved because the proposal will worsen the already bad traffic situation on Maple Avenue due to the coincidence of School traffic with rush hour traffic and inadequate parking facilities. In particular, they point to the queue of cars which extends out of the School entrance onto Maple Avenue during peak periods.
In support of their argument, plaintiffs cite sections 61(a)(2) CT Page 1013 and 17(d)(8) of the Regulations. Section 6-1(a)(2) provides: "This Article and the zoning regulations contained in this Chapter shall be for the following purposes: . . .(2) Lessening congestion in the streets; . . ." Section 6-17 (d)(8) of the Regulations states that in granting a special permit, the Commission "shall consider in each case whether the proposed use will: . . . (8) Not adversely affect safety in the streets nor increase traffic congestion in the area so as to be inconsistent with an acceptable level of service nor interfere with the pattern of highway circulation."
At the first hearing held on the preliminary application, plaintiffs submitted a "Resolution" signed by 35 area residents opposing Brunswick's application on grounds that they are already adversely affected by the traffic generated by the School. (Record I, Item 13-E.) They also submitted copies of photographs depicting parking conditions on School property which show cars waiting in the parking lot to drop off or pick up students, crowded parking conditions, and cars parked on the street during special events. (Record I, Item 13-F; Item 13-G; Item 14, pp. 48-50, 58-9, 60.) Neighboring and area residents also wrote letters and/or testified in opposition and explained how the traffic is already heavy and dangerous and will only get worse. (Record I, Item 14, pp. 48-50, 51-52, 54-55, 59, 65-66, 72-75; Items 16, 19-B, 19-C, 19-D, 20; Record II, Item 18, pp. 24-33.) Others requested that a traffic study be made of the intersection of Maple Avenue, Patterson Avenue, and North Street or of a larger area. (Record I, Item 19-A; Item 21, p. 16.) Two neighbors testified that they had trouble exiting their driveways. (Record I, Item 14, pp. 48, 59.)
The record shows that both the existing entrance and exit to the School parking area are on the southbound side of Maple Avenue. (Record I, Item 37, Site Plan; Item 35, Existing Parking Plan.) In front of the School, Maple Avenue is a one lane road traveling south and a two lane road traveling north, while south of the School. Maple Avenue narrows somewhat. (Record II, Item 18, pp. 43-44.) At the beginning and end of every school day, cars queue in the parking area waiting to drop off or pick up students. (Record I, Item 9, Traffic Study, pp. 5-6; Record II, Item 21, Traffic Study, pp. 5-6.) The Parking and Traffic Impact Study submitted by Brunswick shows that the afternoon traffic is worse than the morning traffic and that in the afternoon, a queue of fifteen (15) cars waiting for students to exit the School forms in the parking area, four (4) or five (5) of which back out onto Maple Avenue into the southbound lane and block traffic. (Record I, Item 9, pp. 5-6; Record II, Item 21, pp. 5-6.)
When the Commission approved the preliminary site plan, it urged Brunswick to proceed to the final site plan stage, CT Page 1014 indicating that certain modifications must be resolved prior to submission of a final site plan. (Record I, Item 27; Record II, Item 9.) Modification number 7 required Brunswick to develop "a comprehensive school related parking need reduction and management plan", suggested alternatives, and stated that the "geographic area to be considered is the general neighborhood of the schools including all school parking sites and neighborhood roadways." It also stated that the "Commission was concerned about [sic] traffic and safety issues attributable to the school due to on-street parking and student drop off and pick up. " Modifications 3, 4, and 5 required the submission of plans concerning the relocation and construction of the driveway to the Tree Warden and Town Engineer. (Record I, Item 27; Record II, Item 9.) The Commission's concerns regarding traffic and parking were also stated in a memorandum to the Town Traffic Engineer, dated August 15, 1989. (See Record I, Item 28; Record II, Item 11.)
In response to concerns raised by opponents at the Commission hearings and by the Commission itself regarding traffic and parking, Brunswick submitted the following information to the Board: In 1987, in response to complaints of parking pressures in the neighborhood of the School, the Town, after a series of hearings imposed an ordinance prohibiting morning parking on Maher Avenue. (Record II, Items 5, 13, 27, 28; Item 18, p. 10.) Since then, Brunswick added 32 parking spaces on its property, limited the number of student permits to juniors and seniors only, took successful measures to encourage the use of school buses and carpools, provided a financial subsidy for the cost of bus transportation for out-of-town students, staggered dismissal times, reduced the need for employee parking by adding six units of on-site faculty housing, and made arrangements with the Second Congregational Church, the Greenwich Women's Club, and the Greenwich Academy for overflow parking during special events. (Record II, Items 5, 13, 27, 28, 29; Item 18, p. 11-13.) Also, Brunswick indicated that demand for parking in the 1989/90 school year will be reduced by five driving age students and that demographic forecasts indicate continued declines in high school enrollments over the next few years. (Record I, Item 14, p. 33; Record II, Item 28.) A parking analysis and plan were submitted which included figures relating to the demand for parking, spaces available, parking assignments, busing and carpooling, and staggered dismissal times. (Record II, Items 27.) Brunswick submitted evidence that there was no deficit of parking spaces and that there were five (5) empty spaces. (Record I, Item 14, pp. 21-2; Record II, Item 21, p. 10.)
Brunswick provided the Commission with a list of School special events (1st Supp. Record I, Item C, p. 6; Record II, Items 7, 13, 27), which it supplies to neighborhood residents (Record II, Item 28), and an accident history for nearby Patterson Avenue CT Page 1015 (Record II, Items 8, 13, 27) and for the surrounding streets. (Record I, Item 14, p. 30; Record II, Item 18, p. 10; Item 21, pp. A-8 to A-9.) The Department of Public Works submitted traffic counts for North Maple Avenue and East Putnam Avenue and for North Street. (Record I, Items 23 and 22, respectively.)
Brunswick also submitted a Parking and Traffic Impact Study, prepared by Storch Associates [the "Traffic Study"]. (Record I, Item 9; Record II, Items 21, 23, 34.) The Traffic Study discusses the significance of Maple Avenue during rush hours, indicating that it is a connector to Route 1 to the south and intersects with North Street, a connector to the Merritt Parkway, to the north. (Record I, Item 9, p. 4; Record II, Item 21, p. 4.) Also, parking observations, traffic counts and accident histories were included, as well as recommended improvements. (Record I, Item 9; Record II, Item 21.)
Based on the Traffic Study, Brunswick proposed, in addition to the measures discussed above, to move the entrance further south, towards the exit, to create a "two-way" driveway with a median fifteen (15) feet in width separating the entrance and exit. (Record I, Item 9, pp. 11-12; Record II, Item 21, pp. 11-12.) This would increase the number of cars which can queue in the parking area from 10 to 30, thereby eliminating the queue of cars onto Maple Avenue and providing room for any increase in traffic to the school. (Record I, Item 14, pp. 28-9; Item 21, pp. 5-6; Item 36, Proposed Parking Plan; Record II, Item 18, p. 12; Item 21, pp. 11-12.) David Spear of Storch Associates testified that the movement of the entrance would not adversely affect the ability of drivers traveling north on Maple Avenue to go around to the right of cars traveling north and waiting to turn left into the entrance, even though the northbound side of Maple Avenue is somewhat narrower at this location. (Record II, Item 18, pp. 43-4.)
A supplemental report by Storch Associates addressing points raised by Mr. Constas in his letter to the Commission of June 15, 1989 (Record I, Item 16), indicates inter alia, that the Lower School traffic accounts for less than 10% of the traffic on Maple Avenue during the morning peak hour, and that the traffic is due to the heavy commuter traffic between the Merritt Parkway and Route 1. (Record I, Item 18-A, p. 1; Record II, Item 23, p. 1; see also Record II, Item 18, p. 40.) A parent of a Lower School student testified that most of the traffic was due to commuters using Maple Avenue. (Record I, Item 14, pp. 68-70.) Also, as suggested by Mr. Constas at the hearing on October 12, 1989 (Record II, Item 18, p. 31), the Commission ordered Brunswick to obstruct but maintain the existing entrance "for the purpose of evaluating the performance of the new drive." (Record II, Item 43.) CT Page 1016
The applicant also met with the Traffic Engineer to discuss questions and concerns regarding the traffic situation at which time the above discussed measures were agreed upon. (Record II, Item 27.) Following this meeting, the Traffic Engineer reported to the Commission that the "applicant addressed all questions and concerns to the satisfaction of this office." (Record II, Item 27.)
Plaintiffs claim that the movement of the entrance to the school to a distance of fifteen (15) feet from the exit "is in clear contradiction of the Greenwich requirements, which call for at least 20 feet separation for safety purposes, Greenwich Roadway design Manual, Design Feature, `Minimum Tangent Distance between Driveways — 20'." However, the cited document is not part of the Regulations and is not included in the record. Therefore, the court cannot make a determination as to whether it is applicable under the facts of this case and cannot determine the validity of this claim.
While all of the above evidence would seem to support the Commission's decisions the evidence, as plaintiff argues was based on an increased enrollment at the Lower School to 170 or 180 students. The Traffic Study submitted by Brunswick with its application for preliminary site plan approval states that it was prepared in May, 1989. (Record I, Item 9.) At that time, the Lower School enrollment was 141 students. (Record I, Item 13-B; Record II, Item 6, p. 2.) The Traffic Study submitted with the preliminary application was based on an increase in enrollment at the Lower School to 170 students. (Record I, Item 9, p. 10.) In that study, it is "estimated that 30 new students would generate approximately 5 additional vehicles that would be in the queue waiting to pick up children at the end of the day . . . mak[ing] the queue length approximately 20 vehicles." (Record I, Item 9, p. 11.) At the first hearing on the preliminary application, Commission Ragland questioned Brunswick referring to the expansion in enrollment to 170 students. (Record I, Item 14, pp. 9-10.) Also, the enrollment statistics submitted to the Commission at both the preliminary and final site plan stages showed the projected enrollment in 1991-92 for the Lower School to be 170 students and the projected enrollment for the Upper, Middle and Lower Schools combined to be 515 students. (Record I, Item 13-B; Record II, Item 31.) Thus, preliminary site plan approval was based on an increase in enrollment at the Lower School to 170 students.
Subsequently, however, rather than approving an enrollment cap of 170 students for the Lower School, the Board approved a limitation of 515 students for the Upper, Middle and Lower Schools combined to give Brunswick flexibility in responding to changing demographics. (Record II, Item 32.) The Board believed that CT Page 1017 since the Lower School would have only ten classrooms, this would restrict student population at the Lower School and granted Brunswick's request for relief from the prior enrollment limitation subject to the submission by Brunswick of a certification of the enrollment to the Zoning Enforcement Officer as the first day of October each year. (Record II, Item 32.) Because the propriety of the Board's decision is not for the Commission to challenge but must be raised in an appeal from the Board's decision, at the final site plan stage, the Commission was required to consider the possibility that, under the special exception granted by the Board, Brunswick was permitted to increase its enrollment at the Lower School beyond 170 students, as long as the total enrollment at the three schools is 515 students.
The Traffic Study submitted with the application for final site plan approval is nearly identical to that submitted for preliminary approval. (Record I, Item 9; Record II, Item 21.) However, it states that it was prepared in April, 1989, one month before the study which was submitted with the preliminary site plan was prepared. Also, it is based on an increase in enrollment by 40 rather than 30 students, and thus, on an enrollment of 180 students at the Lower School. (Record II, Item 21, p. 11.) Nevertheless, the exact same conclusion was reached concerning the queue of cars at the afternoon pick-up period: "[I]t is estimated that 40 new students would generate approximately 5 additional vehicles that would be in the queue waiting to pick up children at the end of the day . . . mak[ing] the queue length approximately 20 vehicles." (Record II, Item 21, p. 11.) Thus, the studies by Storch Associates indicate that the impact on traffic conditions related to the Lower School would be exactly the same whether the enrollment was increased to 170 or to 180 students.
However, the record does not indicate whether the change in the enrollment figure used by Storch Associates was ever brought to the attention of the Commission or that the Commission ever questioned its results. Nor does it appear that the Commission ever considered the fact that, pursuant to the Board's decision, Brunswick was allowed to increase enrollment at the Lower School above 170 students, or even above 180 students. The record does show, however, that the Commission was concerned with the effects on traffic and queuing at the site which even a small increase of students could cause. For example, the Commission granted final approval on the condition that the Lower School be used for grades 1-5 only because it did not want Brunswick moving its preschoolers to the site stating, "because if you had room for preschoolers and kindergarten coming into the lower school area there might be an impact on queuing and so forth." (Record II, Item 18, p. 22; Item 43.) Also, while Brunswick's application to the Board requested relief from prior imposed limits on enrollment at the CT Page 1018 Lower School (see Record II, Item 32), Brunswick submitted evidence purporting to show that despite increased enrollment in grades 1 through 4, the number of students in grade 5, the "feeder" class to the middle school, would remain relatively constant at 34 students after the project is completed. (Record I, Item 14, pp. 11-15; Record II, Items 6, 13, 27, 31.) Since Upper School students may drive and park in the Lower School lot, the Commission was concerned as to whether the increase in students at the Lower School would result in an increase in Middle and Upper School students in the coming years and questioned Brunswick about this figure. (Record I, Item 14, pp. 11-15.) Thus, the Commission was of the opinion that even a few more students could alter the traffic situation on Maple Avenue.
In light of this concern, the Commission's failure to comment on the fact that the Traffic Study submitted with the final site plan application reached the same results as the study submitted with the preliminary application, even though it was based on a greater increase in students, may indicate that the Commission was not aware that a different enrollment figure was used in the two studies. Furthermore, although the Regulations require the Commission to determine whether traffic congestion will be increased to an unacceptable level; Regulations, section 6-17 (d)(8); the record does not clearly show that the Commission considered the fact that the Board's decision would allow Brunswick to increase its enrollment at the Lower School beyond 170 or 180 students.
The record before the Commission at the preliminary site plan stage, when considered with the modifications which the Commission placed upon its preliminary approval, support the Commission's decision to grant preliminary approval. The court finds that the fact that enrollment will be limited to some extent because the Lower School will have only ten (10) classrooms, and the fact that the Traffic Study submitted with the final application was based on an increase in enrollment to 180 students, provide sufficient evidence on which the Commission could have determined that, even though the Board approved an enrollment limitation of 515 students for the three schools combined, traffic congestion would not be increased unacceptably by granting the final application, the court should not sustain the appeal.
Plaintiffs additionally assert that the applications should not have been approved because they violate the applicable level of service standard. "Level of service" is a term "utilized to describe the ability of a roadway intersection to handle its traffic assignment." (Record I, Item 9, p. 3, Record II, Item 21 p. 3.) More specifically, plaintiffs claim that the Greenwich Plan of Development states that it "should be Town policy, insofar as possible to maintain the "C" Level of Service standard for the CT Page 1019 future", that the site and special permit regulations require the Commission to consider whether the proposals are in conformity with the Plan of Development; Regulations, section 6-15 (a)(1), 6-17 (d)(1); and that the future level of service at the site will be a "D" level.
However, the record shows that this claim was not raised before the Commission. "To allow a court to set aside an agency's determination `upon a ground not theretofore presented . . . deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action."' Hartford Electric Light Co. v. Water Resources Commission, 162 Conn. 89, 107 (1971); Valley View Convalescent Home, Inc. v. Commission on Hospitals,32 Conn. Sup. 300, 302 (C.P. 1975). "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented . . ." Valley View Convalescent Home, 32 Conn. Sup. at 302 (citing Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 155).
Also, it is well established that a plaintiff must exhaust his administrative remedies before appealing to a court of law. Conto v. Zoning Commission, 186 Conn. 106, 114-15 (1982). The doctrine of exhaustion is "`grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's finding and conclusions."' Sharkey v. Stamford, 196 Conn. 253,256 (1985) (citation omitted) (discussing doctrines of exhaustion and primary jurisdiction).
In the instant case, the Commission has been deprived of an opportunity to consider this issue, make a ruling and state its reasons therefor. Furthermore, the court has not only been deprived of the Commission's findings and conclusions on this issue, but also of the Commission's interpretation of its Regulations on this point, to which interpretation the court is required to give great deference. Griffin Hospital v. Commission on Hospitals and Health Care, 200 Conn. 489, 496-97 (1986). Thus, the plaintiffs' failure to raise this claim before the Commission prevents them from raising it on appeal.
Effect on Neighborhood
Plaintiffs also claim that the proposed additions and alterations will have additional negative effects on the neighborhood and will violate various sections of the Regulations. First, plaintiffs argue that the "extra cars [traveling to and from Brunswick] would add to the pollution and adversely affect [plaintiffs'] health and would constitute a nuisance." They claim that the Commission failed to consider this threat to the health of area residents and failed to require an "impact statement" CT Page 1020 addressing this issue.
In support of their claim that the Commission must consider the pollution which will be caused by Brunswick's proposal, plaintiffs cite section 6-1(a)(1) and (8) and section 6-15 (a)(3) of the Regulations. Section 6-1 entitled "Purpose of Article" and the subsections cited provide:
 (a) This Article and the zoning regulations contained in this Chapter shall be for the following purposes:
 (1) Promoting the health, safety, morals and general welfare of the community; . . . (8) Providing for the comfort and general welfare in living and working conditions; . . .
Section 6-15 (a)(3) provides:
 (a) In reviewing site plans the . . . Commission shall take into account the following objectives: . . . (3) The protection of environmental quality and the preservation and enhancement of property values. At least the following aspects [listed as (3)(a) through (3)(g)] of the site plan shall be evaluated to determine the conformity of a site plan to this standard . . .
The use of the phrase "at least" in subsection (3) means that the Commission satisfied the requirement that it consider the protection of environmental quality when it considers the factors set out in subsections (3)(a) through (3)(g), but that the Commission is allowed to consider additional factors. None of the factors listed in subsection (3)(a) through (3)(g) include air pollution. See Regulations, ss. 6-15 (a)(3)(a)-(3)(g).
Plaintiffs also cite section 6-20 (c)(3) as a regulation requiring the rejection of an application if the proposal will create pollution. However, section 6-20 contains standards to be applied by the Board before granting special exceptions. Therefore, the Commission's actions at issue here are not governed by section 6-20.
To the extent, if any, that the above cited sections require the Commission to consider evidence of the pollution that will allegedly be caused by Burnswick's proposal, the only evidence presented to the Commission by plaintiffs was a letter in which Mr. Constas made several statements concerning the contents of a 1976 report from the Associated Press, New York. Mr. Constas claims that in that report, Dr. William Blumer of Switzerland concluded that the death rate from cancer was nine times higher CT Page 1021 among those living close to a state highway. (2nd Supp. Record I, only item.) The report itself was not submitted. Plaintiffs refer to their testimony concerning pollution before the Board on June 20, 1989, but that testimony is not part of the record on which the Commission acted.
In their brief dated May 4, 1990, plaintiffs ask that the court "take judicial notice of the connection between traffic congestion and disease, the concern of those living on extensively traveled public highways, and the increase of disease and death from pollution, based on proximity to the source of the pollution . . . [and] the fact that additional traffic must be generated by additional students, and that additional traffic generates additional pollution." However, in an administrative appeal, it is not the function of the court to make findings of fact. Primerica v. Planning Zoning Commission, 211 Conn. 85, 96
(1989); Burnham v. Planning Zoning Commission, 189 Conn. 261,266 (1983). The issue is "whether the record before the agency supports the decision reached." Primerica, supra at 96. Therefore, the court cannot take judicial notice as requested. The plaintiffs have failed to sustain their burden of proving that the Board acted improperly. See AdolPhson, supra at 707.
Plaintiffs also seem to be arguing that they introduced enough evidence on the issue of pollution to make out a "prima facie case" under section 22a-17 of the General Statutes, that the burden of proof then shifted to Brunswick to rebut plaintiffs' case, and that the court must review the issue of whether the Commission should have required an environmental impact statement. In support of these propositions, plaintiffs cite Manchester Environmental Coalition v. Stockton, 184 Conn. 51 (1981).
Section 22a-14 through 22a-20 of the General Statutes are known as "The Environmental Protection Act of 1981." Conn. Gen. Stat. section 22a-14 (rev'd to 1989). Section 22a-16 allows any person to bring an action for declaratory and equitable relief "for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. section 22a-16
(rev'd to 1989). Section 22a-17, the section cited by plaintiffs, provides:
ss. 22a-17. Defense. Appointment of master or referee.
 (a) When the plaintiff in any such action [for declaratory and equitable relief] has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, CT Page 1022 water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. Except as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principals of burden of proof and weight of the evidence generally applicable in civil actions.
 (b) The court before which such action is brought may appoint a master or referee . . . to take testimony and make a report to the court. . . .
Conn. Gen. Stat. ss. 22a-17 (rev'd to 1989).
First, the instant case is not an action for declaratory and equitable relief under sections 22a-16 and 22a-17, but an administrative appeal under section 8-8. Second, as already noted, although plaintiffs claim to have presented evidence on the issue of pollution, the record contains no such evidence except for their opinions and a representation that a report supporting their position exists. (2nd Supp. Record I, only item.) Plaintiffs refer to their testimony before the Board, but that testimony is not part of the record on which the Commission acted. Thus, even if the instant case was brought under section 22a-17, the plaintiffs have not "come forward and show[n] that the defendant has, or is reasonably likely to unreasonably pollute, impair, or destroy a natural resource." Manchester Environmental Coalition, supra at 58 (discussing a plaintiff's burden under section 22a-17 on pages 57-9).
Also, the plaintiffs cite Manchester Environmental Coalition for the proposition that an agency's determination that no impact statement is necessary is subject to judicial review. Id. at 67 n. 20. However, the court in that case was discussing section 22a-1b(b), part of the Environmental Policy Act, which provides that "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such proposed action make a detailed written evaluation of its environmental impact. . . ." Conn. Gen. Stat. section 22a-1b(b) (rev'd to 1989) (emphasis added). The "purpose of the CT Page 1023 Environmental Policy Act is to ensure . . . consideration of environmental risks . . . before the state commits its resources to the particular use of a site." Westport v. State 204, Conn. 212, 220 1987) (emphasis added) (citations omitted). The Commission is not a state agency. See Klug v. Inland Wetlands Commission,19 Conn. App. 713, 716-20 (1989) (UAPA definition of "agency" as "state board, commission, department or officer" does not include municipal inland wetlands agency). Thus, section 22a-1b(b) does not require the Commission to prepare an environmental impact report. Nor do the sections of the Regulations governing the requested special exception state that such a report is required. See Regulations, section 6-14, 6-15, 6-17).
Therefore, on the issue of air pollution, the plaintiffs have failed to sustain their burden of proving that the Commission's decisions are without support in the record and that the Commission acted arbitrarily, illegally, or in abuse of its discretion.
In various sections of their briefs, plaintiffs have also raised the following claims: They argue that any additional building by Brunswick would violate the spirit of the Regulations in that their purposes, as stated in sections 6-1(a)(5) and (7), are "[p]reventing over-crowding of land and avoiding undue concentration of population," and "[c]onserving the value of buildings. . . ." They also claim that the proposal will "materially adversely affect adjacent areas . . ." in violation of section 6-17 (d)(4); will not "be in scale with and compatible with surrounding uses [and] buildings . . ." in violation of section 6-17 (d)(9); will "materially adversely affect residential uses" in violation of section 6-17 (d)(11); will not "preserv[e] and enhance[e] . . . property values" in violation of section 6-15 (a)(3); and will not provide "buffering between similar and dissimilar uses to assure light, air, privacy and freedom from nuisance or other disturbance" in violation of section 6-15 (a)(3)(a).
However, the record reflects that the Department of Public Works reported to the Commission that it had no objection to Brunswick's plans. (Record II, Item 16; see also Record I, Item 11-D.) There is also testimony and evidence that the neighborhood is not solely a residential one but that in addition to Brunswick School, the Second Congregational Church, the Stanton Hotel, dentists' offices, law offices, the Women's Club, a physical therapy office, and the Greenwich Academy are all located in the Maple Avenue area. (Record I, Item 14, p. 38; Record II, Item 24, p. 3; Item 32.)
In addition, Paul Hopper, an architect who testified on behalf of Brunswick, presented slides to the Commission of the existing buildings and the proposed additions and alterations. CT Page 1024 (Record I, Item 14, pp. 15-19; Record II, Item 25.) He also went over the floor plans at the first public hearing. (Record I, Item 14, pp. 19-20.) Complete floor plans and elevation drawings were submitted. (Record I, Items 32, 33.) Also, Thomas Gorin, a realtor who spoke on behalf of Brunswick, testified that the proposed addition will be in keeping with the character of the neighborhood, that in his experience, residential neighborhoods which have schools are more attractive to potential buyers, and that the additions are not large and would not snuff out light. (Record I, Item 14, pp. 37-41.) A parent of a Lower School student testified that the proposed gables on the additions are more characteristic of the neighborhood than the existing structure. (Record I, Item 14, p. 71-2.) An area resident expressed her opinion that the best way for neighbors to protect their real estate value would be to make Brunswick the "centerpiece" of this part of town. (1st Supp. Record I, Item A.)
In urging Brunswick to proceed to the final site plan stage, the Commission made clear that approval of the final plan would be subject to the resolution of modifications addressing certain concerns raised at the public hearings. (Record I, Item 27; Record II, Item 9.) Prior to approval of the final plan, the Architectural Review Committee [the "ARC"] reviewed the proposal and made suggestions concerning external building materials and landscaping. (Record II, Item 37.) The Commission conditioned its approval of the final plan on satisfactory resolution of the ARC's comments and suggestions. (Record II, Item 43.) Also, white pines are to be planted along the southern property line, a bond for landscape plantings must be submitted to the Tree Warden, and the Tree Warden is to inspect all tree protection measures prior to commencement of any construction. (Record II, Item 43.) Only one tree will have to be removed. (Record I, Item 13-D.)
Therefore, the Court finds that the record supports the Commission's decisions with regard to these issues and the plaintiffs' appeals are denied.
LEHENY, J.
ENDNOTES